Edward W. Swanson, SBN 159859
ed@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant DAVID MARGEN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                                   Plaintiff,<br><br>        vs.<br><br>DAVID MARGEN,<br><br>                                   Defendant. | Case No. CR 11-0425 PJH<br><br>**DEFENDANT DAVID MARGEN'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO 18 U.S.C. § 3553**<br><br><br>Sentencing Hearing: November 29, 2017<br>Time: 2:30 p.m.<br>Court: Hon. Phyllis J. Hamilton |

/ / /

/ / /

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  THE PRESENTENCE REPORT ...................................................................... 2

III.  SENTENCING RECOMMENDATION ............................................................ 3

  A.  The Nature of the Offense and the History and Characteristics of the Defendant (Section 3553(a)(1)) ............................................................................................. 3

    1.  The Nature of the Offense and Mr. Margen's Substantial Assistance ............................ 3

    2.  The History and Characteristics of the Defendant ........................................................ 4

      i.  *Mr. Margen's Challenging Upbringing and History of Mental Health Issues* ............ 4

      ii.  *Mr. Margen's Post-Offense Rehabilitation and Good Works* .................................... 6

      iii.  *Outside of the Offense Conduct, Mr. Margen has Led a Law-Abiding Life Characterized by Hard Work* .............................................................................. 10

  B.  Need for the Sentence to Achieve the Goals of Sentencing (Section 3553(a)(2)) .... 11

  C.  The Need to Avoid Unwarranted Sentence Disparity (§ 3553(a)(6)) ...................... 12

IV.  CONCLUSION ................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) .................................................. 10

**Docketed Cases**

*United States v. Charles Gonzales*, CR. 14-00099 PJH ......................................................... 12

*United States v. Hilton Wong*, CR. 12-00082 PJH ............................................................... 12

*United States v. Peter McDonough*, CR. 13-00144 PJH ........................................................ 12

*United States v. Robert Kramer*, CR. 11-00423 PJH............................................................. 12

*United States v. Rudolph S*ilva, CR. 14-00002 PJH ............................................................. 12

**Statutes**

18 U.S.C. § 3553(a) ............................................................................................... passim

**Rules**

§ 5K1.1............................................................................................................... passim

**Defendant David Margen's Sentencing Memorandum**
*United States v. Margen*, CR 11-0425 PJH

## I.      INTRODUCTION

During the years this case has been pending, Mr. Margen has made remarkable strides in rehabilitating himself and repaying the debt he owes society for committing his crime.  Through extraordinary dedication and hard work, Mr. Margen dealt with the mental health issues arising from his troubled upbringing that made him vulnerable to committing the criminal conduct in the first place.  He has also contributed his time and attention to helping others, in the form of hundreds of hours of volunteer at local charities and through the generosity and kindness he has shown to family and friends.  The letters and commendations submitted with this memorandum show Mr. Margen to be a fundamentally well-intentioned person whose own insecurities contributed to his decision to commit the crimes at issue, but who has otherwise led an exemplary life.  In addition, Mr. Margen, unlike almost every other defendant in this case, ceased his criminal conduct before his arrest and indictment.  Additionally, after being indicted, Mr. Margen immediately began cooperating with the government, provided substantial assistance through multiple proffer sessions, and was one of the first individuals to plead guilty.  A term of incarceration is not necessary to deter future criminal conduct by Mr. Margen or others or to protect the public.

In its Presentence Report ("PSR"), the Probation Office recommends an eight-month sentence.  The recommendation includes a four-month downward variance from the low-end of the Guidelines on the basis of Mr. Margen's 18 U.S.C. § 3553(a) factors but does not account for his cooperation.  Undersigned counsel understands the government may be making a motion under U.S.S.G. § 5K1.1 to reduce Mr. Margen's sentence by 35% from the low end of the Guidelines and recommending the resulting sentence of eight months' custody.  The government's recommendation, however, does not account for any of the § 3553(a) factors,

1

including those identified by the Probation Office in support of its recommended downward variance. And neither the government's nor the Probation Office's recommendations address the statutory mandate to avoid unwarranted sentencing disparity. Numerous similarly-situated cooperating defendants have received probationary sentences from this Court.

The proper sentence for Mr. Margen should account for his cooperation, his individual characteristics and the other factors under § 3553(a), as well as the many other sentences imposed by this Court in related cases. Counsel submits this memorandum to request that the Court impose a probationary sentence that includes four months of home detention with electronic monitoring. This sentence accounts for the government's anticipated § 5K1.1 motion and recommendation of an eight-month sentence, reduces that sentence by the Probation Office's four-month downward variance, and transforms the 4-month custodial period into 4 months of electronic monitoring in order to avoid unwarranted sentencing disparities.

## II.   THE PRESENTENCE REPORT

Mr. Margen agrees with the Guidelines calculation in the PSR and has no objection to the restitution amount recommended made by the Probation Office. Mr. Margen asks that two factual issues be clarified or corrected in the PSR, neither of which have a direct effect on the Guidelines calculation. First, the last sentence of paragraph 10 reads: "The defendant objects to the statement that conspirators were often able to acquire the properties at the lowest possible price." Mr. Margen has not made any such statement and agrees the effect of the conspiracy was to suppress competition so the conspirators could acquire properties at the auctions for the lowest possible prices. Second, the date in the first sentence of paragraph 18 should be "1988," not "1998."

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Probation Office recommends a sentence of eight months' incarceration, representing a four-month downward variance from the applicable Guidelines range of 12 to 15 months, as well as a $61,000 fine. Sentencing Recommendation ("Sent. Rec."), pg. 1. The Probation Office bases its downward variance recommendation on Mr. Margen's "chaotic, unpredictable, and dysfunction[al]" childhood, as well as his struggle with mental health issues, primarily anxiety and depression. *Id*. at 3. The Probation Office's sentencing recommendation does not account for any departure under a § 5K1.1 motion by the government. *Id*. As discussed further below, Mr. Margen agrees that a downward variance is warranted but submits that taking into account all of the § 3553(a) factors, the probationary sentences received by other cooperating, similarly-situated defendants, and the government's anticipated § 5K1.1 motion, a non-custodial sentence with four months of home detention and a $20,000 fine are appropriate.

## III.    SENTENCING RECOMMENDATION

### A.    The Nature of the Offense and the History and Characteristics of the Defendant (Section 3553(a)(1))

#### 1.    The Nature of the Offense and Mr. Margen's Substantial Assistance

Mr. Margen had no involvement in the planning or creation of the scheme at issue. Instead, for many years Mr. Margen and his partners in a real estate investment partnership attended the foreclosure auctions but declined to participate in the illegal activity, despite being the object of ridicule by other bidders. PSR, 18-19. Only after this partnership dissolved and Mr. Margen attended the auctions alone did his psychological vulnerabilities (discussed further below) lead him to cave to the pressure placed on him by other bidders. He participated in the criminal scheme from approximately March 2009 to June 2010 (*id*. at ¶8), at which point he withdrew and endured threats from the remaining conspirators. Declaration of Britt Evangelist

in Support of Sentencing Memorandum ("Evangelist Decl."), **Ex. A**, pg. 4 (describing how after

exiting the scheme, Mr. Margen "got a lot of pushback" and one bidder "pointed a hand gesture

at [Mr. Margen] mimicking pointing a gun at him and shooting him").  After his indictment in

this case, Mr. Margen immediately began cooperating with the government.  He proffered in four

separate sessions with the government, produced documents that assisted with the government's

case against other defendants, and provided all the information he had to offer.  PSR, ¶¶ 13-22.

Mr. Margen pled guilty on August 10, 2011.  Dkt. 14.  Of the 40 related cases pending before

this Court and reviewed by counsel, only one other defendant (Robert Kramer) pled guilty before

Mr. Margen.  In the parlance of § 5K1.1, Mr. Margen provided truthful, complete and reliable

information that assisted the government at a time when this prosecution was in its infancy.

U.S.S.G. § 5K1.1 (factor (2), regarding "the  truthfulness, completeness, and reliability of any

information . . . provided by the defendant" and factor (5), regarding "the timeliness of the

defendant's assistance").

  2.  The History and Characteristics of the Defendant

    i.  *Mr. Margen's Challenging Upbringing and History of Mental
      Health Issues*

Mr. Margen is the youngest of four children.  His two oldest brothers, twins, Paul and

Claude, suffered from multiple neurological and emotional disabilities that caused daily

outbursts and tantrums.  As described in the confidential psychological evaluation prepared by

Dr. Robert Kaufman (Evangelist Decl., **Ex. B**), his brothers' conditions had a number of negative

effects on Mr. Margen's upbringing.  It created a disturbing and frightening home environment.

His parents (understandably) focused their attention on caring for the twins, leaving Mr. Margen

and his other brother, Peter, to fend for themselves emotionally from a very young age.  **Ex. B** at

4, 13.  As described by Mr. Margen's brother in his letter to the Court, caring for the twins

caused both parents to become withdrawn, and their mother became emotionally disturbed to the

point of hospitalization:

> In all, there were four children in our family with David being the youngest. Our two older brothers were twins (both deceased) who suffered multiple neurological and emotional disabilities. Our father was a physician and professor/department chair at the University of California Berkeley and our mother was a musician and music therapist. Growing up in the home was difficult as our older brothers' disabilities and associated needs overshadowed our own. There were nightly tantrums and outbursts with both boys. Our parents each dealt with the situation differently. Our father retreated into his work and our mother suffered bouts of severe depression which necessitated hospitalization on several occasions. Our father was withholding with praise or encouragement. Our mother was emotionally absent.

**Ex. A** at 4.

At age 11, Mr. Margen asked to see a therapist and began treatment.  **Ex. B** at 6.  From

that point forward, Mr. Margen struggled with depression and anxiety and received treatment for

both.  *Id*. at 7 (describing psychiatric history and treatment); PSR, ¶ 72.  For the past 25 years, he

has been treated by Dr. Henry Markham; for the past 15[1] years he has attended group counseling

sessions; and for the past 15 years he has taken anti-depressants.  *Id*.  Dr. Markman and Dr.

Kaufman both describe Mr. Margen's familial pre-disposition towards depression and how his

traumatic childhood and emotionally unavailable parents caused him to develop deep feelings of

unhappiness and inadequacy that made him vulnerable to others who might try to take advantage

of him.  **Ex. B** at 10-11 (Dr. Markman's description of Mr. Margen's psychological tendencies);

*id*. at 13-14 (Dr. Kaufman's analysis of the same).  The mental health professionals agree that

Mr. Margen's psychological makeup in this regard likely contributed to his decision to engage in

the criminal conduct in this case:

---

[1] Paragraph 72 of the PSR states that Mr. Margen has been attending group therapy sessions for 10 years. Mr. Margen has actually been attending group therapy since approximately 2012.  *See* **Ex. A** at 7.

**Defendant David Margen's Sentencing Memorandum**
*United States v. Margen*, CR 11-0425 PJH

[Mr. Margen's] need for affirmation and acceptance is so deep that he periodically will set aside his judgments of others, and will try to fit in regardless of the group. This appears to be the case with the individuals involved in the public and private auctions in question. [¶] It seems clear that Mr. Margen was a follower in the world of foreclosure auctions and if anything was stunningly passive if not naïve. He was treated poorly and aggressively, but could neither leave nor stand up to his cohort group.

*Id*. at 14; *see also* **Ex. A** at 8 (Gary Hoeber, MFT: "From a psychological point of view, David had a strong need to belong and had difficulty asserting himself with others. These problems, which have since been remedied, made him vulnerable to persuasion and pressure and led to him going along with the illegal activities that took place during these auctions.").

As summarized by the Probation Office, Mr. Margen's "childhood was chaotic, unpredictable, and dysfunction[al] due to his disabled older twin brothers, his mother's mental health issues and emotionally unavailability, and the lack of guidance in the household." Sent. Rec., pg. 3; *see also* **Ex. A** at 9 (Peter Margen stating he "believe[s] these early experiences had a major impact on David. There was/is significant emotional scarring from our family of origin and a deep desire for professional recognition from our father.") These mental and emotional scars persisted into his adulthood and caused major depression, anxiety, and feelings of inadequacy even before the events giving rise to this case. As the Probation Office found, this history mitigates Mr. Margen's conduct and warrants a downward variance. Sent. Rec., pg. 3.

         ii.     *Mr. Margen's Post-Offense Rehabilitation and Good Works*

After the criminal charges, Mr. Margen's depression intensified to a life-threatening point. **Ex. B** at 7-8; **Ex. A** at 4 (Mr. Margen's partner of 8 years describing how he "grew extremely depressed and anxious to the point that it was difficult for him to function . . . This depression lasted a full year, and it was a terrible thing to witness such suffering that seemed endless. I really feared for his life."). A profound sense of shame and remorse for his criminal

6

conduct overcame Mr. Margen.  **Ex. B** at 7-8 (Kaufman report); *id*. at 14 (describing Mr. Margen as "an overly-sensitive individual who is tormented by shame and remorse); **Ex. A** at 9 ("Shortly after he was first charged in this matter David expressed to me his embarrassment, deep regret and fear of incarceration. Above all he worried about the impact of his actions on our family. David subsequently became severely depressed[.]").  Dr. Markman describes Mr. Margen's depression following the charges in this case "as severe as any I have treated in my career." Evangelist Decl., **Ex. C** (Nov. 11, 2017 letter from Dr. Markman).

When more conventional treatments and medications failed, Mr. Margen made the extraordinary decision to undergo electroshock therapy.  Dr. Kaufman describes electroshock therapy as treatment "considered only in instances where virtually all other forms of treatment have failed" and one that in his 25 years of experience he has only seen used a handful of times. **Ex. B** at 15.  Those closest to Mr. Margen, his brother and sister-in-law, describe his decision to undergo shock therapy as "risky" (**Ex. A** at 9) and "extremely courageous" given the "concerns of everyone in the family that he might be irreparably harmed."  **Ex. A** at 12.  They describe Mr. Margen's motivation to undergo the frightening procedure as made "out of a desire to face his situation and wrestle with his mental suffering full on."  *Id*.

Fortunately for Mr. Margen, the shock therapy procedures, approximately 20 treatments in all (PSR, ¶ 73), brought him relief.  The electroshock therapy and other psychiatric treatment have benefited Mr. Margen, not only by pulling him out of his deep depression, but also by allowing him to work on the psychological vulnerabilities that got him into this case in the first place.  In his letter to the Court, Mr. Margen describes the change he has undergone:

> It took a long time and lots of intense treatment for me to find my way out of that depression and to come to grips with my situation, but over the past couple of years I have.  Through hard work with my doctors and thanks to the support of

my friends and family, I am now back on the right track.  I still take medication
and attend a therapy group regularly, and today I am a humbler, healthier person
emotionally than when this case began, and I have a better understanding of how I
got here.

PSR, ¶ 26; *see also* **Ex. C** (Dr. Markman describing the changes he has seen in Mr. Margen

during the years he has been awaiting sentencing: "I think Mr. Margen really learned from

experience and his mistakes, that rules apply to him, and that seeking approval in the way he had

done all his life leads nowhere, or worse. Mr. Margen is [a] more confident, realistic, and

generous person now.")'

In the years since his arrest, Mr. Margen's generosity, empathy and commitment to

helping others, traits instilled in him by his parents during his upbringing, has become an even

more prominent feature in his life.  Mr. Margen cared for his Alzheimer-stricken mother and his

disabled brother Claude before their deaths.  According to Peter Margen, "David was very

involved in [his mother's] care, took her to medical appointments and checked in on her

frequently as he lived nearby."  **Ex. A** at 9.  And his sister-in-law, recounts how Mr. Margen

"demonstrated great kindness for many years in his care giving of his own older brother":

> There were frequently various sudden emergencies and crises (i.e., sick cats,
> plumbing problems, home repairs, food needs, even a 'friend' who periodically
> committed elder abuse by intimidating Claude and falsely claiming that Claude
> owed him money). Since David lives in Berkeley, he was often the point person to
> rush to Claude's aid. David was patient and faithful and never complained about
> the ongoing calls for help especially in the last four years when Claude received a
> diagnosis of Parkinson's. Moreover David worked tirelessly to ensure that Claude
> could remain in his home independently which Claude wanted more than
> anything.

**Ex. A** at 11; *id*. at 1 (Lori Brown describing how "David unfailingly would stop whatever he was

in the middle of to attend to Claude's requirements . . . he did so with patience and grace").

Mr. Margen's empathy and generosity extended beyond those in his immediate orbit.  For example, twice per year he volunteers his talents as a bass guitar player to help raise money for a local fire station.  *Id*. at 3.  Gary Hoeber, the psychotherapist who leads Mr. Margen's weekly support group, describes a particularly touching example of generosity by Mr. Margen towards a fellow member of that group:

> He is very generous. Once, when a fellow member of the group was diagnosed with a terminal illness, David funded a trip to Hawaii for the man, his wife and his two children. This family was able have an enjoyable and memorable experience together that they could not have afforded without David's assistance.

*Id*. at 7.

In addition, in the past six years Mr. Margen volunteered an enormous amount of his time to local charities.  As noted in the PSR (¶64), Mr. Margen has been a dedicated volunteer at the Alameda County Food Bank and St. Vincent DePaul.   Both organizations elevated him to supervisory roles where he oversees the work by other volunteers.  *Id*.  In a letter to the Court, one of Mr. Margen's supervisor at the Food Bank explains that he has volunteered a total of 570 hours since April 2011 and that "David has been an extremely dedicated, reliable, capable, versatile, self-motivated and hard-working volunteer."  Evangelist Decl., **Ex. D** at 2. Mr. Margen's volunteer work also earned him a "President's Volunteer Service Award" in 2012, 2013, and 2016.  *Id*. at 4-7.

Mr. Margen's volunteer work has helped not just those he has served but also Mr. Margen himself.  In his letter to the Court, Mr. Margen describes how he "found his place at the Alameda County Food Bank" how he has "felt uplifted and fulfilled by my time at the Food Bank in a way that I never did through my 'real work.'"  PSR, ¶ 26.  Likewise, Mr. Margen's friends, family and treatment providers have noticed his dedication to his volunteer work and

how it has changed him.  **Ex. A** at 2 (Lori Brown observing that Mr. Margen enjoys his volunteer work and describing him as "an Advocate for Social Justice"); *id*. at 6 (Alex Georgakopoulos stating he has "been impressed that David has made [volunteer work] part of his life, not simply to please the Court, but because he reconnected to a core value of his and his family's to serve others"); *id*. at 8 (accord).

In sum, after his arrest, Mr. Margen did the hard work to come to grips with his mental health issues and emerged healthier than when the case began, with an insight into why he agreed to the criminal conduct in the first place.  He has also dedicated good portions of his post-offense life to helping others.  As his brother puts it, Mr. Margen has "displayed a level of empathy, commitment and engagement which seem directly attributable to his experiences over the past 5 years" and has "truly . . . become a better person."  *Id*. at 9.  The Court should consider this post-offense rehabilitation in reaching an appropriate sentence for Mr. Margen.  *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) ("In *Pepper* and *Gall*, the Supreme Court made clear that post-sentencing or post-offense rehabilitation—particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct—was a critical factor to consider in the imposition of a sentence.")

   *iii.* *Outside of the Offense Conduct, Mr. Margen has Led a Law-Abiding Life Characterized by Hard Work*

Mr. Margen has no criminal history whatsoever outside of this case.  (PSR, ¶¶ 39-46). Before and since the offense conduct, Mr. Margen, despite the challenges he faced during childhood and beyond, has continuously held down a job and worked hard.  As described in the PSR, Mr. Margen started his professional life at age 19 as a talented musician and bass guitar player for the band Santana.  *Id*. at ¶ 88.  After his musical career no longer provided a steady

income, Mr. Margen went into real estate development and investment.  *Id*. at ¶¶ 15-19.  He has

been a success in that industry both before and after the offense conduct in 2009 and 2010.

**B.      Need for the Sentence to Achieve the Goals of Sentencing (Section 3553(a)(2))**

The preventative goals of sentencing such as deterrence and public protection can be

achieved without a custodial sentence.  (18 U.S.C. § 3553(a)(2)(A)-(C)).

The letters and reports submitted to the Court are replete with testimonials that Mr.

Margen is a good person who made a terrible mistake, has paid for that mistake dearly in the

form of a debilitating episode of depression, and who will not make a similar mistake in the

future.  *E.g*., **Ex. A** at 5 (Alex Georgakopoulos: "Although not being asked in a professional

capacity, I do not have concerns about David's chance of re-offending, given that he has worked

hard within our group process to process his past decision-making."); *id*. at 8 (Gary Hoeber: "I

see this as evidence that David is well on his way to being fully rehabilitated and that he will

continue to be a positive force in the community."); **Ex. B** at 14 (Dr. Kaufman opining: "The

likelihood of him re-offending in the future is exceptionally slim given the impact [ ] this arrest

has had on him."); **Ex. C** at 2 (Dr. Markman opining: "I think that through this incredibly

difficult and long period, in which his future was uncertain and he had significant time to mull

over what had done, Mr. Margen emerged as a stronger and better person. In this sense, I am

confident he has been rehabilitated.").  Likewise, in his letter to the Court, Mr. Margen explains

he is "deeply sorry" and "very ashamed" for his actions and describes how he has tried to make

things right by cooperating, preparing to pay full restitution for his crimes, and committing his

time to volunteer work.  PSR, ¶ 26.  Moreover, the lack of criminal history itself speaks to the

fact that incarceration is not needed to deter future criminal behavior by Mr. Margen or to protect

the public.

11

Nor will a probationary sentence leave Mr. Margen unpunished.  He will stand convicted of a serious federal felony and suffer the societal and other consequences such a conviction carries.  He will pay restitution of $63,000 and a fine.  In addition, Mr. Margen has already suffered the punishment of struggling through a severe, life-threatening bout of depression.  To be sure, Mr. Margen brought this upon himself through his own conduct and choices.  But the collateral consequences of this prosecution and conviction should not be ignored, and as § 3553 provides, Mr. Margen's punishment should be just.  A term of incarceration is not needed to protect the public or deter Mr. Margen or others similarly situated from committing future crimes.  Probation is a just sentence.

**C.       The Need to Avoid Unwarranted Sentence Disparity (§ 3553(a)(6))**

The Court should also depart from the Guidelines range to avoid unwarranted sentencing disparity between Mr. Margen and his fellow co-conspirators.  The Court has imposed a number of probationary sentences on similarly situated or more culpable defendants in the bid-rigging conspiracy.  *See, e.g., United States v. Robert Kramer*, CR. 11-00423 PJH (sentenced to three years probation, a $20,000 fine, and 10 months LMON, but where double the volume of commerce involved ); *United States v. Hilton Wong*, CR. 12-00082 PJH (sentenced to three years probation, a $20,000 fine, and eight months LMON, but where defendant initially denied wrongdoing and did not plead guilty until March 2012); *United States v. Peter McDonough*, CR. 13-00144 PJH (sentenced to three years probation, a $20,000 fine, and nine months LMON, but where greater volume of commerce involved and defendant did not plead guilty until April 2013); *United States v. Rudolph S*ilva, CR. 14-00002 PJH (sentenced to three years probation, a $6,000 fine, and 10 months LMON, but where defendant did not plead guilty until 2014); *United States v. Charles Gonzales*, CR. 14-00099 PJH (sentenced to three years probation, a $20,000

12

fine, and eight months LMON, but where cooperation did not occur until August 2014, four years after being charged).  In light of the sentences in these related cases and given Mr. Margen's comparable (or lesser) culpability, counsel submits that a probationary sentence with four months of home detention and electronic monitoring is sufficient but not greater than necessary to achieve the goals of sentencing and avoid unwarranted sentencing disparity.

## IV.    CONCLUSION

For the foregoing reasons, counsel respectfully requests the Court impose a sentence of probation with four months of home detention and electronic monitoring on David Margen, as well as $63,114 in restitution and a fine of $20,000.


Dated: November 22, 2017                          _____/s/_____
                                                  Edward W. Swanson
                                                  Britt Evangelist
                                                  SWANSON & McNAMARA LLP
                                                  Attorneys for David Margen

**Defendant David Margen's Sentencing Memorandum**
*United States v. Margen*, CR 11-0425 PJH